**NOT FOR PUBLICATION**                                                          **CLOSED**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| TRAVELODGE HOTELS, INC., a<br>Delaware Corporation | : : : | |
| Plaintiff, | : : | **OPINION** |
| v. | : : | Civ. No. 03-799  (WHW) |
| ELKINS MOTEL ASSOCIATES, INC., a<br>West Virginia Corporation; and ROGER<br>FUSSELL, an individual, | : : : : | |
| Defendants. | : : : : | |

**Walls, District Judge**

    Plaintiff Travelodge Hotels, Inc. ("Plaintiff" or "THI") moves for summary judgment on

the First, Third, Fifth, and Seventh Counts of its First Amended Verified Complaint (the

"Complaint") and seeks dismissal of Defendants Elkins Motel Associates, Inc. ("EMA") and

Roger Fussell's ("Fussell") (together, the "Defendants") Counterclaims.  Plaintiff states that if it

is granted summary judgment on these claims, it will dismiss Counts Two, Four, and Six of the

Complaint.  The motion is decided without oral argument pursuant to Fed. R. Civ. P. 78.  The

motion is granted.

### FACTS AND PROCEDURAL BACKGROUND

    The following facts are undisputed unless otherwise noted: THI is one of the largest guest

lodging facility franchise systems in the United States, comprised of various federally-registered

trade names, service marks, logos and derivations thereof (the "Travelodge marks").  THI does not own or operate any hotels: it licenses its trademarks to franchisees who own and operate the hotels under the Travelodge name.  THI has the exclusive right to sublicense the Travelodge marks and its distinctive franchise system, and has invested a substantial effort over a long period of time to develop consumer recognition of the Travelodge marks.

Defendant EMA is a West Virginia corporation with its principal place of business at the guest lodging facility in Elkins, West Virginia.  Defendant Fussell is the sole shareholder of EMA.  Fussell built the lodging facility, and has operated it since 1983 both as an independent facility and as a franchisee.

On or about October 13, 2000, THI entered into a License Agreement (the "License Agreement") with EMA for the operation of a 63-room lodging facility located in Elkins, West Virginia.  Pursuant to section 5 of the License Agreement, EMA was obligated to operate a Travelodge guest lodging facility for a 15-year term, during which time EMA would be permitted to use the Travelodge marks.  Under section 7 and schedule C of the License Agreement and section 2 of the Addendum to the License Agreement, EMA was required to make certain periodic payments to THI for royalties, service assessments, taxes, interest, reservation system user fees, annual conference fees and other fees (collectively, the "recurring fees").  Section 7.3 of the License Agreement states that interest would accrue at the rate of 1.5% per month on all payments that became past due.  Section 11.2 permits THI to terminate the License Agreement with notice to EMA for various reasons, including EMA's 1) failure to pay any amount owed to Plaintiff under the license agreement; 2) failure to remedy any other default of its obligations or

warranties under the agreement within 30 days of receipt of written notice from Plaintiff; or 3) receipt of two or more notices of default in any one year period, regardless of whether the defaults were cured.  Section 12.1 states that in the event THI terminates the License Agreement pursuant to section 11.2, EMA would pay liquidated damages to THI in accordance with a specified formula.  Section 7 of the Addendum specifically set liquidated damages at $1,000.00, multiplied by the number of guest rooms at the facility, 63, for a total of $63,000.00.  Section 13 provides that if the License Agreement is terminated, EMA must immediately cease using the Travelodge marks and reimburse THI for any costs associated with removal of THI's signage. With regard to legal matters, section 17.4 directs that "[t]he non-prevailing party will pay all costs and expenses, including reasonable attorneys' fees, incurred by the prevailing party to enforce this Agreement or collect amounts owed under this Agreement."  (Cox Aff. at Ex. A).

THI and Fussell also signed a Guaranty Agreement (the "Guaranty") effective as of the date of the License Agreement.  According to the terms of the Guaranty, Fussell agreed that upon default of the License Agreement, he would "immediately make each payment and perform or cause Licensee to perform, each unpaid or unperformed obligation of licensee under the Agreement."  (Cox Aff. at Ex. C).  Under the Guaranty, Fussell also agreed to pay the costs, including reasonable attorneys' fees, incurred by THI in enforcing its rights or remedies under the Guaranty or the License Agreement.

On August 20, 2001, Fussell signed a letter agreement with THI (initially dated June 1, 2001) whereby THI agreed to credit EMA $7,000.00 to off-set the costs of setting up or installing the property management system.  The letter states that in consideration of the credit, EMA, "on

behalf of itself, its partners, officers, employees, directors, shareholders and Guarantors, and the

successors and assigns of all of them, hereby releases and holds harmless [THI], its officers,

employees, agents, directors, shareholders, and the successors and assigns of all of them from

any and all claims and causes of action whatsoever arising prior to and through the date of this

letter relating to the offer, sale, negotiation, default, termination and reinstatement of the [THI]

License Agreement for the Unit."[1]  (Cox Aff. at Ex. D).

Sometime in 2001, EMA stopped paying its recurring fees.  (Fussell Dep. at 165:16-23).

In a letter dated June 13, 2002, THI advised EMA that it had failed to file monthly reports for the

Elkins facility, was in default of its financial obligations due to its failure to pay the recurring

fees, and had ten days within which to cure the defaults.  The letter added that if the defaults

were not cured, then the License Agreement would be subject to termination.  Thereafter, in

another letter dated August 20, 2002, THI gave EMA notice that it was still in default of its

financial obligations as it had not paid the recurring fees.  THI advised EMA that if it failed to

cure its defaults by November 20, 2002, it would terminate the License Agreement.

In a November 22, 2002 letter, THI terminated the License Agreement and demanded

EMA 1) discontinue the use of the Travelodge marks and any other indicia of operation as one of

THI's facilities, 2) remove all items bearing the Travelodge marks, 3) change all signs and any

listings in directories and similar guides that identified the hotel as a Travelodge, 4) pay THI

$63,000.00 as liquidated damages for early termination of the agreement, 5) de-identify the hotel

---

[1]Defendants admit that this is what the letter agreement says and that they signed it.
(Fussell Aff. at ¶ 84).

as a Travelodge within 14 days from the receipt of the letter, and 6) pay all outstanding recurring fees through the date of termination.

In letters of December 3, 2003 and February 19, 2004, THI repeated EMA's post-termination obligations, including the requirement that EMA de-identify the facility as a Travelodge.  However, EMA continued to use the Travelodge marks after the License Agreement was terminated.[2]  THI claims that it was granted access to EMA's premises on March 8, 2004, to remove the Travelodge signs.  EMA claims that it hired a sign removal company, Floyd, to remove the sign.

THI's complaint asserts seven counts against the Defendants.  The First Count seeks a permanent injunction and damages for trademark infringement under the Lanham Act.  The Second Count seeks an accounting of all the revenue generated by the facility as a result of operating the hotel with the Plaintiff's marks.  The Third Count is a claim for liquidated damages pursuant to the License Agreement and Addendum.  The Fourth Count is an alternative claim for actual damages resulting from early termination of the License Agreement, should the Court find the liquidated damages clause unenforceable.  The Fifth Count seeks recurring fees owed by Defendants to Plaintiff plus prejudgment interest.  The Sixth Count is an alternative claim for unjust enrichment.  The Seventh Count is a claim against Fussell under the Guaranty.  Plaintiff also seeks attorneys' fees and costs of suit in accordance with the Lanham Act, the License

---

[2]Defendants admit in their Opposition to Plaintiff's motion that they did not have the Travelodge sign removed from the facility until over a year after termination of the License Agreement.  (Defs' Br. at 16).

Agreement and the Guaranty. Defendants have asserted counterclaims against Plaintiff for breach of contract and failure to mitigate damages.

## LEGAL STANDARD

Summary judgment is appropriate where the moving party establishes that "there is no genuine issue as to any material fact and that [it] is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A factual dispute between the parties will not defeat a motion for summary judgment unless it is both genuine and material. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986). A factual dispute is genuine if a reasonable jury could return a verdict for the non-movant and it is material if, under the substantive law, it would affect the outcome of the suit. See id. at 248. The moving party must show that if the evidentiary material of record were reduced to admissible evidence in court, it would be insufficient to permit the non-moving party to carry its burden of proof. See Celotex v. Catrett, 477 U.S. 317, 318, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986).

Once the moving party has carried its burden under Rule 56, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts in question." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986). To survive a motion for summary judgment, a nonmovant must present more than a mere scintilla of evidence in his favor. Woloszyn v. County of Lawrence, 396 F.3d 314, 319 (3d Cir. 2005). The opposing party must set forth specific facts showing a genuine issue for trial and may not rest upon the mere allegations or denials of its pleadings. Shields v. Zuccarini, 254 F.3d 476, 481 (3d Cir. 2001). At the summary judgment stage the Court's function is not to

weigh the evidence and determine the truth of the matter, but rather to determine whether there is

a genuine issue for trial.  See Anderson, 477 U.S. at 249.  In doing so, the court must construe the

facts and inferences in the light most favorable to the non-moving party.  Curley v. Klem, 298

F.3d 271, 277 (3d Cir. 2002).

**DISCUSSION**

**I.      Liability on Counts Three, Five and Seven**

Plaintiff claims that Defendants are liable under the License Agreement and Guaranty for

outstanding recurring fees and liquidated damages.  Plaintiff further says that there is no dispute

that Defendants stopped paying recurring fees, and that the License Agreement and Guaranty are

unambiguous with regard to Defendants obligation to pay such fees.

First, this Court must consider whether the terms of the contract were clear and

unambiguous.  When the "terms of a contract are clear and unambiguous there is no room for

interpretation or construction and the courts must enforce those terms as written."  City of

Orange Tp. v. Empire Mortg. Services, Inc., 341 N.J. Super. 216, 224, 775 A.2d 174, 179 (App.

Div. 2001) (citing Kampf v. Franklin Life Ins. Co., 33 N.J. 36, 43, 161 A.2d 717, 720 (1960);

Levison v. Weintraub, 215 N.J. Super. 273, 276, 521 A.2d 909 (App. Div. 1987), certif. denied,

107 N.J. 650, 527 A.2d 470 (1987)).  Whether a contract provision or term is clear or ambiguous

is a question of law and therefore suitable for a decision on a motion for summary judgment.

Driscoll Const. Co., Inc. v. State, Dept. of Transportation, 371 N.J. Super. 304, 313-14, 853 A.2d

270, 276 (App. Div. 2004).  A review of the relevant provisions of the License Agreement and

Guaranty leads this Court to the conclusion that the language with respect to recurring fees and liquidated damages is not ambiguous.  This issue is not raised by the Defendants.

The second inquiry concerns whether the Defendants complied with the terms of the License Agreement and Guaranty.  Plaintiff contends that they have not been paid recurring fees since 2001.  Their supporting evidence consists of the Defendants' answers to Plaintiff's Initial Interrogatories and Fussell's deposition testimony.  In answer to Plaintiff's Initial Interrogatories asking Defendants to state whether they had paid all recurring fees, Defendants said that they "stopped paying the fees because plaintiff breached the agreement."  (Plocker Aff. at Ex. P, ¶ 15).  Fussell also admitted at his deposition that Defendants stopped paying recurring fees to Plaintiff sometime in 2001.  (Id. at Ex. Q, 165:16-23.).  While Defendants deny Plaintiff's assertion that they had failed to pay the outstanding recurring fees and liquidated damages, Defendants offer no evidence to contradict this statement. See, e.g., Port Auth. of N.Y. & N.J. v. Affiliated FM Ins., 245 F.Supp.2d 563, 572 n.9 (D.N.J. 2001) ("...it is incumbent on the responding party to issue a meaningful rejoinder to a given statement of material fact, lest that fact be deemed undisputed").  In light of this uncontradicted evidence and the unambiguous contract terms, all the elements necessary to establish a breach of the License Agreement and Guaranty by the Defendants are present.

Next, this Court must determine whether the Defendants have any defenses to the breach.  Rather than claim that they did not breach the License Agreement and Guaranty, Defendants argue that there are genuine issues of material fact regarding certain actions by Plaintiff that allegedly caused Defendants to default on their payments to Plaintiff.  Specifically, Defendants

argue that certain quality assurance inspectors who inspected the lodging facility either
intentionally or negligently issued failing scores for the facility on April 13, 2001, and June 14,
2001.  Defendants claim that because of these failing scores, they defaulted and lost the
following rights: 1) the ability to terminate the License Agreement as provided in section 4.1 of
the Addendum; 2) the right to pays fees equal to only 6.5 percent of gross room revenues for the
first two years of the License Agreement, as opposed to 8.5 percent, pursuant to section 2 of the
Addendum; 3)  the right to participate in a sales and marketing training program, pursuant to
section 6 of the Addendum; 4) the right to use the central reservation system; and 5) the right to
borrow money from THI at favorable rates.

      Defendants claim that Plaintiff breached the License Agreement by "administering unfair
and inconsistent quality assurance inspections as to force Elkins into default."  (Defs' Br. at 2-3).
They add that this material breach excused their performance under the contract.  See Jafari v.
Wally Findlay Galleries, 741 F. Supp. 64, 68 (S.D.N.Y. 1990) ("[W]here a party materially
breaches, he has failed to substantially perform the contract, and the other party is discharged
from performing his obligation.").  New Jersey courts recognize that a material breach by either
party to a bilateral contract excuses the other party from rendering any further performance.  See
Magnet Resources, Inc., v. Summit MRI, Inc., 318 N.J. Super. 275, 286, 723 A.2d 976, 981
(App.Div. 1998), which teaches that:

      Where a contract calls for a series of acts over a long term, a material breach may
      arise upon a single occurrence or consistent recurrences which tend to defeat the
      purpose of the contract. In applying the test of materiality to such contracts a court
      should evaluate the ratio quantitatively which the breach bears to the contract as a
      whole, and secondly the degree of probability or improbability that such a breach
      will be repeated.

Id.   However, Defendants do not point to any express provision of the License Agreement that obligates Plaintiff to conduct quality assurance inspections in a certain manner.

The acts alleged by Defendants, however, may amount to a breach of the implied covenant of good faith and fair dealing, a covenant read into all contracts in New Jersey.  See Wade v. Kessler Institute, 172 N.J. 327, 340, 798 A.2d 1251, 1259 ( 2002).  Under such a covenant, "neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract."  Id.   While Plaintiff may not have materially breached an express term of the License Agreement, this Court must consider whether there is evidence to conclude that the Plaintiff  materially breached the implied covenant of good faith and fair dealing.

Defendants have not presented more than a scintilla of evidence to create a genuine issue of material fact with regard to this defense.  First, to maintain a cause of action based on the implied covenant of good faith and fair dealing, the Defendant must show bad faith or ill motive.  Seidenberg v. Summit Bank, 348 N.J. Super. 243, 257, 791 A.2d 1068, 1076 (App. Div. 2002). "[A]n allegation of bad faith or unfair dealing should not be permitted to be advanced in the abstract and absent an improper motive."  Brunswick Hills Racquet Club, Inc. v. Route 18 Shopping Center Associates, 182 N.J. 210, 231, 864 A.2d 387, 399 (2005).  To survive a motion for summary judgment, Defendants must show that there is a genuine issue of material fact as to whether the Plaintiff acted with bad faith or ill motive and, if so, that Plaintiff's breach of the implied covenant was material.

The evidence Defendants offer to support their claim of a material breach is found in Fussell's affidavit and deposition testimony, a letter from THI granting waivers with respect to certain inspection items, and the inspection reports from December 20, 2000, April 13, 2001, June 14, 2001, September 26, 2001, February 1, 2002, and June 10, 2002.  This evidence is unconvincing.  While Fussell believes the results of the inspections were false, he did not accompany any of the inspectors on the inspections at issue, he did not review the inspection results with the inspector, and he does not know whether anyone else from his hotel discussed the inspection results with the inspector.  (Fussell Dep. at 179:15 - 180:12).  Indeed, Fussell testified that the basis for his allegations is simply that the quality assurance failures seemed "just very coincidental."  (Fussell Dep. at 186:4-10).  Fussell adds that he had "no way of knowing" whether THI intentionally assigned failing quality assurance scores to the Facility.  Id.  All this testimony amounts to are conclusory allegations.  Construing this evidence in a light most favorable to Defendants, this evidence does not adequately support the required elements of bad faith or materiality.  The variance in the grading of the facility by different inspectors, and the Plaintiff's failure to retroactively apply certain waivers for points taken off by the inspectors do not support a reasonable conclusion that the Plaintiff purposefully arranged for Defendants to receive failing scores so as to deprive them of the benefits of the contract.  Because there is no genuine issue of material fact regarding a material breach by the Plaintiff that would excuse Defendants' performance under the License Agreement, that defense must fail as a matter of law.

-11-

Moreover, the Defendants expressly waived and released any claims based on the April and June 2001 quality assurance inspections and THI's June 28, 2001.  On August 20, 2001, Defendants executed a letter agreement with THI (originally dated June 1, 2001), pursuant to which Defendants expressly released THI from "any and all claims and causes of action whatsoever arising prior to and through the date of this letter relating to the offer, sale, negotiation, default, termination and reinstatement of the THI License Agreement for the [Facility]."[3]  (Cox Aff. at ¶ 28; Fussell Aff. at Ex. N).  "In New Jersey, an exculpatory release will be enforced if 1) it does not adversely affect the public interest; 2) the exculpated party is not under a legal duty to perform; 3) it does not involve a public utility or common carrier; or 4) the contract does not grow out of unequal bargaining power or is otherwise unconscionable. Gershon v. Regency Diving Ctr., Inc., 368 N.J. Super. 237, 248, 845 A.2d 720, 727  (App. Div. 2003) (citations omitted).  Of the Gershon factors for evaluating exculpatory release clauses, only the fourth factor is applicable: whether the contract grows out of unequal bargaining power or is otherwise unconscionable.  Defendants have not presented any evidence to suggest that they were at a disadvantage when bargaining with the Plaintiff, or to show why the Letter Agreement is otherwise unconscionable.

Plaintiff adds that even if it did breach the License Agreement, its breach would not bar its claim against the Defendants for breach of the agreement.  Plaintiff relies on McDonald's Corp. v. Robert A. Makin, Inc., 653 F. Supp. 401 (W.D.N.Y. 1986) for support.  The

---

[3]Although Defendants claim that THI "made [EMA] sign" the Letter Agreement (Defs' Opp. at 13), Fussell testified that they willingly signed that document.  (Fussell Dep. at 177:2-11).

McDonald's plaintiff had entered into an agreement with the defendants to franchise a restaurant. The franchise agreement obligated the defendants to make monthly payments to the plaintiff and provided the plaintiff with the right to terminate the license if the Defendants defaulted in their payments. The plaintiff alleged that the defendants stopped making monthly payments pursuant to the franchise agreement and that the defendants owed the plaintiff $40,129.48. The plaintiff asserted claims against the defendants for breach of contract and sought to recover amounts due under the franchise agreement. The defendants admitted that they had not made the payments, but alleged that they were not due because of various breaches of the agreement by the plaintiff. Specifically, the defendants alleged that the plaintiff had violated antitrust laws, discriminated amongst franchisees, breached a contractual duty not to deprive the defendants of the benefits of the franchise agreement, and interfered with the defendants' pre-contractual relations. The defendants made these allegations as part of their affirmative defenses and counterclaims against the plaintiff, and added at oral argument that these actions caused their inability to pay.[4] The plaintiff argued that none of the affirmative defenses or counterclaims excused the defendants failure to pay, and the court agreed. In finding for the plaintiff, the court held that absent an affirmative defense excusing the defendants' failure to pay, the defendants were not entitled to stop making payments while continuing to possess and operate the franchise property.

Like the Defendants in McDonald's, Defendants here stopped paying the recurring fees in violation of the License Agreement, yet continued to use the Plaintiff's trademark. (Fussell

_____

[4]The case adds, however, that the defendants' counterclaims did not allege that the plaintiff's conduct caused the non-payment. Nevertheless, the court reaches the same conclusion regarding the effect of the defendants' affirmative defenses and counterclaims on the plaintiff's claims. McDonald's Corp., 653 F.Supp. at 403.

Dep. at 167-8; Cox Aff. at Ex. H; Defs' Br. at 16).  This Court finds that the Plaintiff's alleged

material breach, even if proved, would not excuse payment by the Defendants, as long as they

continued  to use the Travelodge marks.  It is a well settled principle of contract law, that

"[u]nder no circumstances may the non-breaching party [to a contract] stop performance and

continue to take advantage of the contract's benefits."  S&R Corp. v. Jiffy Lube Int'l, Inc., 968

F.2d 371, 376 (3d Cir. 1992).  "Under basic contract principles, when one party to a contract

feels that the other contracting party has breached its agreement, the non-breaching party may

either stop performance and assume the contract is avoided, or continue its performance and sue

for damages."  Id.; see also McDonald's, 653 F. Supp. at 405 ("It is against the law as well as

sound morals to permit a party to a contract to repudiate the contract or his obligation under it,

and at the same time retain the consideration that he has received.").  Defendants here stopped

their performance under the contract, yet continued to take advantage of the contract's benefits.

Because of the Defendants' failure to make their required payments pursuant to the License

Agreement and Guaranty, while continuing to use the Travelodge marks, the Plaintiff is entitled

to summary judgment on the issue of liability for Counts Three, Five and Seven.

II.     **Liability on Count One**

        Plaintiff next argues that it is entitled to summary judgement on its claims under Sections

32 and 43(a) of the Lanham Act for the unauthorized use of Plaintiff's trademarks following

termination of the License Agreement.  Section 32 of the Lanham Act prohibits the unauthorized

use in commerce of "any reproduction, counterfeit, copy, or colorable imitation of a registered

mark in connection with the sale, offering for sale, distribution, or advertising of any goods or

services on or in connection with which such use is likely to cause confusion, or to cause

mistake, or to deceive." 15 U.S.C. § 1114(a)(1). Section 43(a) creates a cause of action for the

false designation of the origin of goods or services:

> Any person who, on or in connection with any goods or services, or any container
> for goods, uses in commerce any word, term, name, symbol, or device, or any
> combination thereof, or any false designation of origin, false or misleading
> description of fact, or false or misleading representation of fact, which--
> (A) is likely to cause confusion, or to cause mistake, or to deceive as to the
> affiliation, connection, or association of such person with another person, or as to
> the origin, sponsorship, or approval of his or her goods, services, or commercial
> activities by another person, . . . shall be liable in a civil action by any person who
> believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a)(1)(A). This Court has previously stated that "[t]he law governing trademark

infringement under section 43(a) of the Lanham Act, which protects unregistered trademarks,

generally follows the law governing infringement of registered trademarks, which are protected

under section 32." Bijur Lubricating Corp. v. Devco Corp., 332 F.Supp. 2d 722, 726-27 (D.N.J.

2004) (citing Island Insteel Sys., Inc. v. Waters, 296 F.3d 200, 206 n.1 (3d Cir. 2002)). While the

following analyses regarding the "validity of a trademark" and the "authority to use a trademark"

pertain to only section 32 of the Lanham Act, the third element, "likelihood of confusion,"

pertains to both sections 32 and 43(a).

   The first question is whether the trademarks were valid. Federal registration of a

trademark is prima facie evidence of a mark's validity. 15 U.S.C. § 1115(a). The Travelodge

marks have been registered with the United States Patent and Trademark Office, and Defendants

do not contest that Plaintiff owns the Travelodge marks or that the marks are valid.

The second question is whether the Defendants' had the authority to continue using the Travelodge marks.  Termination of a trademark license precludes any further use of the trademark by the licensee.  United States Jaycees v. Philadelphia Jaycees, 639 F.2d 134, 143 (3d Cir. 1981); see also S & R Corp., 968 F.2d at 375.  Following the termination of the License Agreement on November 22, 2002, the Defendants lacked the authority to use the Plaintiff's Travelodge mark.

Third, "[t]o prevail on a claim for trademark infringement or unfair competition under the Lanham Act, the owner of a valid and legally protectable mark...must show that a defendant's use of a similar mark for its goods 'causes a likelihood of confusion.'"  KOS Pharms., Inc. v. Andrx Corp., 369 F.3d 700, 708-09 (3d Cir. 2004).  The Third Circuit has held that there is a great likelihood of confusion when a party uses the exact same trademark as the Plaintiff here.  S & R Corp., 968 F.2d at 375 (citing Opticians Ass'n of America v. Independent Opticians of America, 920 F.2d 187, 195 (3d Cir.1990)).  It is clear that EMA is using THI's Travelodge mark.  As a matter of law, there exists a likelihood that the concurrent use of the trademark by both entities will create consumer confusion about EMA's affiliation with the THI franchise.

 Defendants do not dispute that they continued to use the Travelodge marks after Plaintiff terminated the License Agreement on November 22, 2002.  Rather, they argue that EMA did not intentionally use the Travelodge marks without authorization and that they made every effort to have the sign removed as soon as possible.  Specifically, Defendants claim that they entered into a contract with a sign company to have the sign removed, but the sign company would not remove the sign during the winter months.  Furthermore, Defendants argue that the Plaintiff bore

the duty to remove the sign, and once the License Agreement was terminated, the sign became THI's property.

This Court finds Defendants' arguments are without merit.  Section 13 of the License Agreement makes plain that in the event the License Agreement is terminated, EMA is to immediately cease using all of the Travelodge marks.  (Cox Aff. at Ex. A, ¶ 13).  There is no dispute that Defendants were put on notice by the Plaintiff's letter of November 22, 2002 that the License Agreement was terminated, and that Defendants were to discontinue their use of the Travelodge marks.  (Cox Aff. at ¶ 31).  Defendants were also notified on December 5, 2003, and February 19, 2004, that they had not yet complied with their obligation to de-identify the facility as a Travelodge.  (Cox Aff. at ¶ 34).  Yet they did nothing.  According to the Plaintiff, the signs were not removed until March 8, 2004.  (Cox Aff. at ¶ 36).  Even the Defendants admit that the sign was not removed from the facility until over a year after termination of the License Agreement.[5]  (Defs' Br. at 16).

Nor can this Court accept the Defendants' claim that they had taken "every effort to have the THI sign removed."  The Defendants' breach led to the termination of the contract. When it came time to remove the sign, Defendants contacted only one sign removal company. Furthermore, the Defendants' claim that once the License Agreement terminated, the sign became THI's property would turn both the laws of trademarks and contracts on their heads.

---

[5]Although the parties dispute who removed the sign, and the date the sign was removed, these issues are not material with regards to Defendants' liability to the Plaintiff under the Lanham Act.  The Defendants had notice of the infringement, the License Agreement clearly states that Defendants had the obligation to remove the sign, and the sign remained on the Elkins Lodge until at least February 23, 2004. (Cox Aff. at Ex. H).

Even if this Court were to find that EMA was the non-breaching party, EMA would still have been obligated to remove the Travelodge sign.  See, e.g., S&R Corp., 968 F.2d at 376 ("Under no circumstances may the non-breaching party [to a contract] stop performance and continue to take advantage of the contract's benefits.").  EMA's actions cannot reasonably be viewed as anything but intentional.  Plaintiff is entitled to summary judgment on the issue of liability for Count One.

**III.    Damages**

Plaintiff has requested that this Court grant its motion for summary judgment with respect to the following damage claims: 1) recurring fees pursuant to Counts Five and Seven of the Complaint; 2) liquidated damages pursuant to Counts Three and Seven of the Complaint; 3) compensatory damages, treble damages, and attorneys' fees under the Lanham Act, pursuant to Count One of the Complaint; 4) prejudgment interest pursuant to Count Five of the Complaint; 5) attorneys' fees and costs of suit in accordance with the Lanham Act, the License Agreement and the Guaranty; and 6) reimbursement for the cost of removing the Travelodge signs from EMA's property.  Defendants object to the Court granting the Plaintiff's motion for summary judgment as to damages on the general grounds that the Court should not grant summary judgment to the plaintiff.  Accordingly, Defendants have not responded to the Plaintiff's individual damage claims.  This Court will address each damage claim in turn.

**A.    Recurring Fees**

Plaintiff seeks reimbursement for outstanding recurring fees in the principal amount of $47,225.13, pursuant to Counts Five and Seven of the Complaint.   The parties do not dispute that the License Agreement and Guaranty obligated Defendants to pay recurring fees to the

Plaintiff, pursuant to section 7 and schedule C of the License Agreement.  In the event of default, the Guaranty promises that either the guarantor or the licensee will "make each payment" and "perform each unpaid or unperformed obligation of the licensee under the agreement."  While the Defendants deny that they owe recurring fees, they do so on the grounds that the Plaintiff breached the agreement, thereby excusing their performance.  This Court has already rejected that claim.  <u>See</u> Section I *supra*.  Accordingly, the Court grants summary judgment on Counts Five and Seven in the amount of $47,225.13.

### B.      Liquidated Damages

Plaintiff seeks liquidated damages in the amount of $63,000.00, pursuant to Counts Three and Seven of the Complaint.  The validity of a liquidated damages clause depends upon whether it reasonably forecasts the harm resulting from the breach, where that harm cannot be easily or accurately estimated.  <u>Wasserman's Inc. v. Middletown</u>, 137 N.J. 238, 249-50, 645 A.2d 100, 106 (1994) (citations omitted); <u>Monsen Eng'g Co. v. Tami-Githens, Inc.</u>, 219 N.J. Super. 241, 251-52, 530 A.2d 313, 318 (App. Div. 1987).  In examining the liquidated damages clause, the court must consider the reasonableness of the clause "either at the time of contract formation or at the time of the breach."  <u>Naporano Assocs., L.P. v. B&P Builders</u>, 309 N.J. Super. 166, 176 (App. Div. 1998) (quoting <u>Wasserman's Inc.</u>, 137 N.J. at 251).  When two commercial parties have comparable bargaining power, there should be a presumption that the liquidated damages clause is valid.  <u>Wasserman's</u>, 137 N.J. at 252.  The party being assessed liquidated damages has the burden "to offer proof of contractually acceptable excuses in order to avoid the application of the liquidated damages clause."  <u>Monsen</u>, 219 N.J. Super. at 250.  Whether an unambiguous

-19-

liquidated damages clause is valid and enforceable is a legal question for the court. Naporano,

309 N.J. Super. at 176 (citing Wasserman's, 137 N.J. at 257).

The liquidated damages clause in this case is contained in section 12.1 of the License

Agreement, and reads that liquidated damages shall total

> an amount equal to the sum of accrued Royalties and System Assessment Fees
> during the immediately preceding 24 full calendar months....Liquidated Damages
> will not be less than the product of $2,000.00 multiplied by the number of guest
> rooms in the Facility.

Section 7 of the Addendum specifically set liquidated damages at "an amount equal to the

product of $1,000.00 multiplied by the number of guest rooms...in the Facility."  THI contends

that this represents a negotiated reduction on liquidated damages from the formula set forth in

section 12.1 of the License Agreement.

According to THI, the language of the liquidated damages clause "demonstrates the

parties' clear intent to choose among the available remedies rather than to set an arbitrary number

having no bearing on the contractual relationship."  (Pl's Br. at 27).   THI also points out the

inherent difficulty of calculating its lost earnings under the License Agreement, as it is dependent

upon a percentage of monthly gross room revenues.   Id.  The room revenues, in turn, are

dependent upon the number of bookings in a given month, which can fluctuate drastically from

month to month.  Id.

The Plaintiff bargained with the Defendants to receive income over the period of the

License Agreement, and has lost the benefit of its bargain due to the Defendants' breach.  EMA

has not offered proof of any contractually acceptable excuses to avoid the application of the

liquidated damages clause.  This Court grants summary judgment for the Plaintiff as to the

damages claims of Counts Three and Seven of the Complaint.  THI is entitled to liquidated damages under the License Agreement and the Addendum in the amount of $63,000.00.

### C.      Lanham Act Damages

Pursuant to the Lanham Act, Plaintiff claims that it is entitled to: 1) compensatory damages in an amount based upon the recurring fees that it would have received during the period of infringement, from November 22, 2002 to March 8, 2004; 2) treble damages due to the Defendants' use of the Travelodge marks following termination of the License Agreement; and 3) attorneys' fees.

Under the Lanham Act, the Plaintiff is entitled to recovery of  "any damages sustained by the plaintiff" to be "assessed by the Court or under the Court's discretion."  15 U.S.C. § 1117(a). Additionally, under subsection b of §1117:

> the court shall, unless the court finds extenuating circumstances, enter judgment for three times such profits or damages,...together with a reasonable attorney's fee, in the case of any violation of section 32(1)(a) of this Act,...that consists of intentionally using a mark or designation, knowing such mark or designation is a counterfeit mark,...in connection with the sale, offering for sale, or distribution of goods or services.

15 U.S.C. § 1117(b).  Although THI's damages cannot be predicted with exact specificity, the Lanham Act authorizes damages even when they are not susceptible to precise calculations.   Ramada Inns, Inc. v. Gadsden Motel Co., 804 F.2d 1562, 1565 (11th Cir. 1987).  Franchise fees normally received for use of a mark are a proper measure of damages under the Lanham Act.  See id.

Here, THI seeks damages based on lost royalties under the recurring fees to which it would have been entitled during the period of EMA's infringement.  That period commenced on

November 22, 2002, the date of the letter from THI to EMA that terminated the License

Agreement, and ended on March 8, 2004, the date when EMA granted THI access to its facility

to remove the Travelodge signs.  (Cox Aff. at ¶¶ 31, 36).  THI claims that is unable to ascertain

the amount of gross room revenue earned at EMA during the period of infringement (Id. at ¶ 48).

Rather, THI estimates their lost revenue from recurring fees from this period to be $38,710.09,

based on the operational history of the facility.[6]  (Id. at ¶51).

　　　　While this Court agrees with the Plaintiff's assessment of damaged under the Lanham

Act, this Court notes that there is a discrepancy with regard to the date that the Travelodge sign

was removed.  Plaintiff states in its Brief and in the Cox Affidavit that the sign was removed on

March 8, 2004). (Pl's Br. at 8; Cox Aff. at ¶ 36).  However, Exhibit I of the Cox Affidavit

contains an itemized statement, stating that the charge for removal of the sign was registered on

May 7, 2004.  (Cox Aff. at Ex. I).  Defendants have disputed that Plaintiff removed the sign on

May 8, 2004, but have not offered any evidence to show otherwise, except to say that they hired a

sign removal company which removed the sign over a year after termination of the agreement.

(Defs' Br. at 16; Fussel Aff. at ¶¶ 98-103).  In light of these facts, this Court finds that the

Plaintiff's calculations concerning the Lanham Act damages should be adjusted to reflect a

termination date of March 7, 2004.

---

[6]To arrive at this estimate, THI multiplies $29,473.59 (the average monthly gross room revenue of EMA from January 2001 to October 2002) times 8.5% (the recurring fees rate for the facility, pursuant to section 7 and Schedule C of the License Agreement).  (Cox Aff. at ¶50).  The result, an average monthly recurring fees amount of $2,505.25, is multiplied by15 months and 14 days (the infringement period) to arrive at $38,710.09. (Id. at ¶51).

This Court also finds that the Defendants' possessed the requisite intent to infringe the Plaintiff's trademark rights. Defendants were put on notice on several occasions that they were displaying the Travelodge marks in violation of their termination duties, yet the sign was not removed until over 15 months after termination of the Franchise Agreement. See Section II *supra*. Having found that Defendants possessed the requisite intent to infringe the Plaintiff's trademark rights, this Court finds that damages should be trebled pursuant to 15 U.S.C. § 1117(b) of the Lanham Act, with all reasonable attorneys' fees.

### D.    Prejudgment Interest

The purpose of prejudgment interest is to reimburse the claimant for the loss of the use of its investment or its funds from the time of the loss until judgment is entered. In re Bankers Trust Co., 658 F.2d 103, 108 (3d Cir. 1981). State law governs the availability of prejudgment interest on state law claims. Mid-Jersey Bank v. Fidelity Mortgage Investors, 518 F.2d 640, 645 (3d Cir. 1975). The general rule in New Jersey is that prejudgment interest will be awarded from the time it accrues until the time judgment is entered. Rova Farms Resort, Inc, v. Investors Ins. Co. Of Am., 65 N.J. 474, 506, 323 A.2d 495, 512 (1974). Prejudgement interest in a commercial case may be determined by a provision in a contract. Utica Mut. Ins. Co. V. DiDonato, 187 N.J. Super. 30, 43, 453 A.2d 559, 566 (App. Div. 1982).

Section 7.3 of the License Agreement states that interest will accrue at the rate of 1.5% per month on all payments that became past due under the License Agreement. In failing to pay the money due THI under the Agreement, Defendants have improperly retained the use of these monies and the benefits so derived. Accordingly, Plaintiff argues that it is entitled to

prejudgment interest at the rate of 1.5% per month on liquidated damages in the amount of

$63,000.00 from December 21, 2002 (30 days following the date of termination) and on all past

due recurring fees from November 22, 2002,  through and including the date of judgment.  This

Court agrees.  Plaintiff's prejudgment interest claim should be granted.  Plaintiff will submit an

appropriate proposed form of Order to the Court calculating the amount of interest owed up to

the date of the accompanying Order, and in accordance with the terms of that Order.

### E.      Attorneys' Fees and Costs

New Jersey law permits parties to contract for the shifting of fees and costs in the event of

litigation between them, subject to judicial supervision for reasonableness.  North Bergen Rex

Transport, Inc. v. Trailer Leasing Co., 158 N.J. 561, 569-570, 730 A.2d 843, 848 (1999).

Reasonableness is assessed both in relation to the amount of success achieved by the party

seeking reimbursement and the prevailing rates for legal services in the relevant professional and

geographical communities.  Id. at 570.

In Section 17.4 of the License Agreement, as incorporated by the Guaranty, EMA agreed

to "pay all costs and expenses, including reasonable attorneys' fees, incurred by [THI] to enforce

this Agreement or collect amounts owed under this Agreement."  Absent any countervailing

considerations, this Court finds that the Plaintiff is entitled to the reasonable attorneys' fees and

costs incurred in connection with this action, as expressly agreed to by Defendants in the License

Agreement and Guaranty.  Plaintiff will submit an affidavit establishing its attorneys' fees and

costs in accordance with Local Civil Rule 54.2.

### F.      Costs of Sign Removal

Plaintiff seeks reimbursement in the amount of $1,272.00 for the cost of removing the Facility's primary signage, pursuant to section 13 of the License Agreement.  Plaintiff's evidence consists of an itemized list of charges to EMA, including a charge on May 7, 2004, for costs of de-identification.  (Cox Aff. at Ex. I).   Defendants have denied this point, and argue that they hired the sign company to remove the sign.  (Defs' Br. at 15-16; Fussell Aff. at ¶¶ 98-103). Section 13 of the License Agreement clearly states that upon termination of the License Agreement, "[Defendants] will remove all signage and other items bearing any Marks and follow the other steps detailed in the System Standards Manual for changing the identification of the Facility."  The duty to remove the sign clearly rested with the Defendants.

While Defendants contend that they hired Floyd Sign Company to remove the sign, they have failed to offer any evidence to support this claim. See Woloszyn, 396 F.3d at 319 (nonmovant must provide more than a mere scintilla of evidence to survive a motion for summary judgment).  For this reason, Plaintiff is entitled to reimbursement in the amount of $1,272.00 for the costs of removing its sign from Defendants' property.

**IV.    Dismissal of Defendants' Counterclaim**

Defendants have asserted two counterclaims against the Plaintiff, the first for breach of contract seeking $22,000.00 in damages, on the grounds that the Plaintiff made false and misleading statements to the Defendant regarding reservation services, marketing support and financial assistance.  The second counterclaim is that the Plaintiff failed to mitigate damages once the Plaintiff became aware of the financial difficulties of the Defendants.  Plaintiff denies

these claims, and further alleges that Fussell, the guarantor, lacks standing to assert claims that belong to the obligor, EMA.

### A.     Standing of Defendant Roger Fussell

Plaintiff contends that Mr. Fussell, the guarantor, lacks standing to assert counterclaims based on THI's failure to comply with its obligations under the License Agreement.  The general rule is that "a guarantor, when sued by the principal's creditor pursuant to a guaranty agreement, cannot rely on an independent cause of action existing in favor of the principal against the creditor as a defense or a counterclaim."  Continental Group, Inc. v. Justice, 536 F. Supp. 658, 661 (D.Del. 1982).  However, one exception to the general rule is when the principal and the guarantor are joined as Defendants.  Id.  Such is the case here.  Defendant Fussell has standing to assert his counterclaims against the Plaintiff.

### B.     Defendants' Counterclaims

#### 1. Breach of Contract

Defendants counterclaim that the Plaintiff breached the License Agreement by making certain promises to the Defendants before forming the contract, and then failing to honor those promises.[7]   Specifically, Defendants claim that they were promised access to a central THI

---

[7]Although the Defendants Counterclaim suggests that the Defendants were fraudulently induced into signing the contract, a literal reading of the Counterclaim leads this Court to interpret the Counterclaim as one for breach of contract. Specifically, Defendants claim the following:

9.      THI *breached the agreement* by providing the misleading statements to Elkins and Fussell, which they relied upon in agreeing to becoming a franchisee.

10.     THI further *breached the agreement* by not ensuring that the promises made to Elkins and Fussell regarding marketing, commitment, Quality Assurance and other factors were adhered to by representatives of THI.

11.     Elkins and Fussell have been damaged in the amount of $22,000.00 (plus cost of

-26-

reservation system that would generate substantial business for the lodge;  a visit from a marketing specialist who would do an in-depth study of the market area to assist in setting room rates; an increase in revenue of 15% from the first year to the second year, otherwise EMA could cancel the contract without penalty; an assurance that they would have no problem maintaining a Quality Assurance mark above the required level; and access to loans from THI at favorable rates.  However, Defendants have failed to reference any specific provisions of the License Agreement that were breached by the Plaintiff, as none of these alleged promises were memorialized by the agreement.

Plaintiff responds that the License Agreement between THI and EMA expressly limits the agreement to the express terms of the agreement.  Section 14.3 of the License Agreement provides that "[t]here are no express or implied covenants or warranties, oral or written, between [THI and EMA] except as expressly stated in this Agreement."  (Cox Aff. at ¶ 21).  Section 17.7.3 of the License Agreement further states that "[t]his Agreement, together with the exhibits and schedules attached, is the entire agreement superseding all previous oral or written representations, agreements and understandings of the parties about the Facility and the License." (Cox Aff. at ¶ 21).  Specifically with regard to marketing support, section 4.3.1 of the Agreement states that "[THI] do[es] not promise that the Facility or [EMA] will benefit directly or proportionately from marketing activities."  (Cox Aff. at ¶ 20).

---

room plus cost of signage) as a result of the *breach of contract* by THI.

Defendants' Counterclaim (emphasis added).

Parties are normally bound by a contract which they have signed and have had the opportunity to read.  Filmlife, Inc. v. Mal "Z" Ena, Inc., 251 N.J. Super. 570, 573, 598 A.2d 1234, 1235 (App. Div. 1991) (citation omitted).  Absent a claim of fraud in the inducement, the parol evidence rule precludes the introduction of oral promises made to "alter or vary an integrated written instrument."  Id.  Fraud requires a showing of "willful misrepresentation" as to the purport or contents of the contract, or a showing that "the fraudulent misrepresentation inducing the signature is as to a thing not dealt with at all in the agreement."  Id. (citations omitted).  The evidence does not suggest that the Defendants were fraudulently induced into entering the contract.  Rather, the evidence suggests that the Defendants were given every opportunity to read the contracts, but failed to do so.  (Dep. of Roger Fussell at 156:21 through 160:2).  Under these circumstances, the Plaintiff cannot be held accountable for the Defendants' failure to read the contract they freely signed.  See Gras v. Assocs. First Capital Corp., 346 N.J. Super. 42, 56, 786 A.2d 886, 894 (App. Div. 2001) ("[f]ailing to read a contract does not excuse performance unless fraud or misconduct by the other party prevented one from reading." (citations omitted)).

In addition to the express limitations noted, both the License Agreement between the two parties and the Letter Agreement, dated June 1, 2001, contain exculpatory release clauses. Section 17.7.2 of the License Agreement states that EMA expressly "release[d] any claims against [THI] or [THI's] agents based on any oral or written representation or promise not stated in this [License] Agreement." (Cox Aff. at ¶ 23).  The Letter Agreement between the two parties specifically releases [THI] "from any and all claims and causes of action whatsoever arising prior

to and through the date of this letter relating to the offer, sale, negotiation, default, termination and reinstatement of the THI License Agreement." (Cox Aff. at ¶ 28).  As stated in Section I, *supra*, an exculpatory release clause will be enforced so long as the contract does not grow out of unequal bargaining power.  Gershon, 368 N.J. at 248.   Defendants have not presented any evidence to suggest that they were at a disadvantage when bargaining with the Plaintiff, or to show why the License Agreement or Letter Agreement are otherwise unconscionable. Accordingly, the Plaintiff did not breach the License Agreement.

### *2. Failure to Mitigate Damages*

Defendants claim that Plaintiff's could have mitigated its damages by terminating the contract sooner, and by removing the Travelodge sign itself.  About mitigation of damages, the law is clear: "Damages will not be recovered to the extent that the injured party could have avoided his losses through reasonable efforts 'without undue risk, burden or humiliation.'" Ingraham v. Trowbridge Builders, 297 N.J. Super. 72, 82-83, 687 A.2d 785, 790-91 (App. Div. 1997) (citing Restatement (Second) of Contracts, Section 350(1),(2) (1981)).  The duty to mitigate generally begins when a party has "reason to know that performance by the other party will not be forthcoming."  Restatement (Second) of Contracts, Section 350, comment b (1981). However, "the burden of proving facts in mitigation of damages rests upon the party breaching the contract."  Ingraham, 297 N.J. Super. at 83 (citation omitted).  Defendants claim that Plaintiff failed to mitigate damages by including additional fees after EMA and Fussell had been unable to pay the original fees, and by failing to remove the sign immediately upon the termination of the License Agreement on November 22, 2002.  Defendants, however, have failed to offer sufficient

evidence to create a genuine issue as to whether the Plaintiff failed to mitigate its damages upon realizing that the Defendants would be unable to perform.  Furthermore, as previously stated, the Plaintiff cannot be held liable for the duty to remove the sign, as that duty rested with the Defendant.  It would have been much easier for the Defendants to remove the sign than it would have been for the Plaintiff.  Ingraham, 297 N.J. Super. at 83 ("where both the plaintiff and the defendant have had equal opportunity to reduce the damages by the same act and it is equally reasonable to expect a defendant to minimize damages, the defendant is in no position to contend that the Plaintiff failed to mitigate." (citations omitted)).

Plaintiff's motion to dismiss the Defendants' counterclaims is granted.

## CONCLUSION

It is on this 17th day of October, 2005,

ORDERED that Plaintiff's motion for summary judgment on Counts One, Three, Five and Seven of Plaintiff's Complaint is GRANTED; and it is further

ORDERED that Counts Two, Four and Six of Plaintiff's Complaint are DISMISSED; and it is further

ORDERED that judgment is entered for Plaintiff and against Defendants for Recurring Fees in the amount of  $47,225.13, and prejudgment interest at a rate of 1.5% per month from November 22, 2002, through and including the date of this judgment; and it is further

ORDERED that judgment is entered for Plaintiff and against Defendants for Liquidated Damages in the amount of $63,000.00, and prejudgment interest at a rate of 1.5% per month from December 21, 2002, through and including the date of this judgment; and it is further

-30-

ORDERED that Plaintiff's counsel provide the Court with a proposed judgment setting forth the amount of prejudgement interest sought, including a calculation thereof, within 30 days of entry of this order; and it is further

ORDERED that judgment is entered for Plaintiff and against Defendants for treble damages under 15 U.S.C. § 1117 of the Lanham Act, and that Plaintiff's counsel provide the Court with a recalculation of damages, from November 22, 2002 through March 7, 2004, within 30 days of entry of this order; and it is further

ORDERED that judgment is entered for Plaintiff and against Defendants for reimbursement costs in the amount of $1,272.00; and it is further

ORDERED that Plaintiff's counsel submit an application for attorney's fees and costs pursuant to Local Civil Rule 54.2; and it is further

ORDERED that Plaintiff's motion for summary judgment on dismissal of Defendants' Counterclaims is GRANTED.

**s/William H. Walls**
United States District Judge

**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

---

| | |
|---|---|
| TRAVELODGE HOTELS, INC., a Delaware Corporation | : |
| | : |
| | : |
| Plaintiff, | : **ORDER** |
| | : |
| v. | : Civ. No. 03-799 (WHW) |
| | : |
| ELKINS MOTEL ASSOCIATES, INC., a West Virginia Corporation; and ROGER FUSSELL, an individual, | : |
| | : |
| | : |
| Defendants. | : |
| | : |
| | : |

---

**Walls, District Judge**

It is on this 17th day of October, 2005,

ORDERED that Plaintiff's motion for summary judgment on Counts One, Three, Five and Seven of Plaintiff's Complaint is GRANTED; and it is further

ORDERED that Counts Two, Four and Six of Plaintiff's Complaint are DISMISSED; and it is further

ORDERED that judgment is entered for Plaintiff and against Defendants for Recurring Fees in the amount of $47,225.13, and prejudgment interest at a rate of 1.5% per month from November 22, 2002, through and including the date of this judgment; and it is further

-32-

ORDERED that judgment is entered for Plaintiff and against Defendants for Liquidated Damages in the amount of $63,000.00, and prejudgment interest at a rate of 1.5% per month from December 21, 2002, through and including the date of this judgment; and it is further

ORDERED that Plaintiff's counsel provide the Court with a proposed judgment setting forth the amount of prejudgement interest sought, including a calculation thereof, within 30 days of entry of this order; and it is further

ORDERED that judgment is entered for Plaintiff and against Defendants for treble damages under 15 U.S.C. § 1117 of the Lanham Act, and that Plaintiff's counsel provide the Court with a recalculation of damages, from November 22, 2002 through March 7, 2004, within 30 days of entry of this order; and it is further

ORDERED that judgment is entered for Plaintiff and against Defendants for reimbursement costs in the amount of $1,272.00; and it is further

ORDERED that Plaintiff's counsel submit an application for attorney's fees and costs pursuant to Local Civil Rule 54.2; and it is further

ORDERED that Plaintiff's motion for summary judgment on dismissal of Defendants' Counterclaims is GRANTED.

                                     **s/William H. Walls**
                                     United States District Judge